UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-11468-RGS

LEE P. UNITT

v.

LUIS SPENCER, et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

April 29, 2021

STEARNS, D.J.

Plaintiff Lee Peck Unitt was incarcerated at the Massachusetts
Correctional Institution in Framingham (MCIF) from April 29, 2013 to
April 8, 2019. In this lawsuit, brought under the Federal Civil Rights Act, 42
U.S.C. § 1983, she alleges that defendants, who are employees of the
Massachusetts Department of Correction (DOC) and the Massachusetts
Partnership for Correctional Healthcare, LLC (MPCH)[1] (respectively, DOC

---

[1] MPCH, a privately owned company, had a contract with DOC to
provide medical services to prisoners incarcerated at DOC facilities from
July 1, 2013 to June 30, 2018.

Defendants[2] and Medical Defendants[3]), failed to provide her with adequate medical care in violation of the Eighth Amendment. Defendants now seek summary judgment. For the following reasons, the court will allow defendants' motions in their entirety.

## BACKGROUND

The facts, viewed in the light most favorable to Unitt as the nonmoving party, are as follows.[4]

Unitt was diagnosed prior to her incarceration with a rare, chronic medical condition known as Fibromuscular Dysplasia (FMD), which is characterized by abnormal cell growth within the artery walls. Secondary to

---

[2] The DOC Defendants include Paul Henderson, Allison Hallett, Dale Bissonnette, Robert Higgins, Jason Allain, Destiny Ordway, Tasha DeBlois, Andrew Bellany, and Joseph Chamberland.

[3] The Medical Defendants include Cesar Novoa, PA, Carrie Holowecki, LCSW, Amanda Brown, RN, Betty Richards, RN, and Lisa Sholudko, RN.

[4] Unitt's statements of undisputed material facts, which are interwoven in her oppositions rather than appended separately, do not comply with the requirement of Local Rule 56.1 to provide "a concise statement of the material facts of record . . . with page references to affidavits, depositions and other documentation." Accordingly, the court will not consider facts within Unitt's oppositions unsupported by citation to admissible evidence and will deem uncontroverted facts admitted. Nor will the court consider facts not material to Unitt's surviving Eighth Amendment claims, such as facts concerning her Written Medical Plan or her requests to see outside specialists, which are alleged violations that the court already dismissed. *See generally* Orders (Dkt ## 76 & 87).

her FMD, Unitt developed hypertension (high blood pressure) and stenosis of the renal artery. Unitt's hypertension continued throughout her incarceration. Coupled with prescriptions that inhibited her ability to thermoregulate, such as hydrochlorothiazide, Loratidine, and diabetic and hypertensive medications, *see, e.g.*, Pl.'s Ex. 16 (Dkt # 152-3), Unitt was at risk for strokes and transient ischemic attacks (TIAs).[5]

Although Unitt always had an 8-inch cooling fan in her MCIF cell, *see* Med. Defs.' Ex. F. (Unitt Dep.) (Dkt # 145-6) Vol. II at 73, 98, she repeatedly requested a 24-inch fan to amplify air circulation. Doctors unaffiliated with MPCH believed that a larger fan might give Unitt more control over her temperature. A neurologist who treated Unitt prior to incarceration, Dr. Roger Kinnard, recommended a fan because "high temperatures can elevate her blood pressure." Med. Defs.' Ex. D (Med. Rs.) (Dkt #145-4) at 29. Dr. Nicolaos Athienies, a nephrologist who treated Unitt in February of 2016, agreed that Unitt's statement that "she could manage temperature control if she has an additional fan in her cell . . . is . . . reasonable." *Id.* at 33.

---

[5] A stroke occurs when a blockage or a blood vessel rupture stops blood flow to a part of the brain. Sometimes referred to as a "mini-stroke," a TIA begins like an ischemic stroke, but is temporary. Blood flow returns on its own and symptoms usually last less than an hour. Med. Defs.' Ex. B (Groblewski Aff.) (Dkt # 145-2) ¶ 19.

MPCH practitioners initially – and repeatedly – denied Unitt's requests for a second fan as not medically indicated. While Unitt reported having unequal hand grasp and being unable to stand for prolonged periods after suffering a fall on March 16, 2016 – symptoms that she attributed then (and continues to attribute) to a stroke, Med. Rs. at 35; Opp'n to Med. Defs.' Mot. (Dkt # 152) at 6 – the MPCH nurse who examined her, Amanda Brown, noted nothing "remarkable," Med. Rs. at 35. On March 21, 2016, Cesar Novoa, a MPCH physical assistant, followed up with Unitt and ordered her a "walking cane for long distances and fall due to TIA."[6] *Id.* Novoa also included an accommodation for a "fan for ventilation," *id.* at 36,[7] but crossed it out upon learning that Unitt already possessed an 8-inch fan, Novoa Aff. ¶ 3.

On April 1, 2016, Unitt met with Carrie Holowecki, then the MPCH health services administrator, to voice her concern about "getting a fan authorized (larger than standard-canteen-sized one), per [Dr. Athienies's recommendation]." Med. Rs. at 35. Holowecki determined that although Unitt was "anxious re TIA (fainting) and climate control," she was not in

---

[6] In attributing Unitt's fall to a TIA, Novoa "simply recorded her report of [the incident]." Med. Defs.' Ex. C (Novoa Aff.) (Dkt # 145-3) ¶ 2.

[7] Dale Bissonnette's signature appears on this form as a DOC Designee. Pl.'s Ex. 1 (Dkt # 153-1).

acute distress and referred her for a follow-up. *Id.* Novoa, who met with Unitt again on April 6, 2016 and on May 16, 2016, concluded both times that a fan, among other requested items, "[was] not medically indicated." *Id.* at 38-39. Although he did not approve a fan for Unitt, Novoa approved other accommodations for her, such as braces, socks, inserts, a wheelchair, extra toilet paper, and extra pillows and blankets. *Id.*[8]

Unrelenting, Unitt conveyed her request for a fan to other DOC employees. Unitt states that Paul Henderson, then the outgoing Superintendent, informed her that he would discuss the request with Allison Hallett, the incoming Superintendent. DOC Defs.' Ex. E (Unitt Dep.) (Dkt # 142-6) at 65-66. She also alleges that she spoke with Captain Robert Higgins and Hallett about the fan on April 18, 2016 and on May 21, 2016, respectively. *Id.* at 79; DOC Defs.' Ex. D (Unitt Dep.) (Dkt # 142-5) at 23.

---

[8] According to a grievance filed by Unitt on April 8, 2016, Novoa "initially refused to renew ANY of [her] medical accomodations [sic]" in apparent retaliation after learning that she complained to Halowecki about the quality of her medical care. Pl.'s Ex. 11 (Dkt # 152-2). Unitt also alleges that Novoa ridiculed her by stating that MPCH is not required to adopt the recommendations of independent specialists. *See* Pl.'s Ex. 21 Mot. (Dkt # 152-3).

On May 25, 2016, the temperature in the prison reached approximately 90 degrees, *see* Pl.'s Ex. 13 (Dkt # 152-2),[9] and Unitt fell unconscious in the MCIF yard, triggering a Code 99 emergency. Unitt presented with low blood pressure during an emergency medical visit but indicated that she felt better after drinking fluids and did not report any injuries to the staff. Med. Rs. at 43. In any event, Novoa submitted a Medical Restriction Form, which Clinical Operations Manager Lisa Sholudko approved on the same day, recommending a second fan "out of an abundance of caution due to the upcoming summer months, her repeated requests for the extra fan, and her increasing anxiety regarding her *self-reported* history of TIAs." Med. Rs. at 42 (emphasis added). Unitt was accommodated with air-conditioned housing from June 1, 2016 to June 24, 2016,[10] when MCIF received the new fan from an outside vendor. Groblewski Aff. ¶ 31; Med. Defs.' Ex. F Vol. II at 110.

In an unrelated incident at MCIF, Unitt injured her right leg. On March 22, 2018, Unitt heard a pop in her anterior shin while walking, after

---

[9] There were general "[h]eat balancing problems in cottages" where Unitt was housed. Pl.'s Ex. 12 (Dkt # 152-2).

[10] Unitt initially rejected this accommodation, which was first offered on May 31, 2016. DOC Defs.' Ex. I (Hermann-Gomes Aff.) (Dkt # 142-10) ¶ 6. She was later housed in the Health Services Unit (HSU), but also stayed at Lemuel Shattuck Hospital from June 19, 2016 to June 22, 2016. *Id.* ¶ 7.

which she observed swelling and bruising that spread to her lower leg, ankle, and foot. Med. Rs. at 79; *see also* Pl.'s Ex. 33 (Dkt # 153-4); DOC Defs.' Ex. F (Unitt Dep.) (Dkt # 142-7) at 63 ("[O]n March 24th . . . my leg was blue black with a red-streaked hematoma.").

Unitt met with medical personnel regarding this injury on several occasions beginning on March 24, 2018.[11] *See* DOC Defs.' Ex. F at 81. MPCH clinicians who examined Unitt's leg and x-rays on March 26 and March 27, 2018 observed a "normal ossification pattern," "[n]o fracture or dislocation," and "soft tissue swelling but no bony abnormalities," which additional x-rays on March 28, 2018 confirmed. Med. Rs. at 78-84. Unitt received various treatments and regular follow-up for this injury, including an ice pack and Tylenol, crutches, an offer to stay in the HSU to minimize the need to ambulate, and a no-work order for two weeks. *Id*. at 76-83.

Unitt nonetheless refused treatment on several occasions. Dr. Tsinteris recommended that Unitt remain in the HSU on March 28,

---

[11] When Unitt brought the injury to the attention of DOC employees, she alleges that Correctional Officer (CO) Tasha DeBlois refused to call medical staff and instructed Unitt "to put in a sick slip." DOC Defs.' Ex. F at 62, 74. Unitt submitted a slip on March 24, 2018, stating that she "sustained a sub'd. hematoma from mid-calf to ankle." Med. Rs. at 77. Betty Richards, a MPCH nurse, evaluated her on the same day. DOC Defs.' Ex. G (Unitt Dep.) (Dkt # 142-8) at 98-99. Unitt also alleges that Richards, CO Andrew Bellany, and CO Joseph Chamberland refused to send her to her physician or to a trauma unit.

2018, but Unitt "refuse[d] . . . after being advised of the risks of worsening internal bleeding and leg injury (possible fracture), delay of healing of right lower leg, worsening pain and function of lower leg." *Id.* at 80-83. Unitt also refused an assessment of her leg on April 2, 2018. *Id.* at 86.

Despite Unitt's concern that FMD caused internal bleeding in her leg from an aneurysm and ruptured artery, which Dr. Tsinteris considered "possible, though very rare," *id.* at 87, the injury improved with conservative treatment. As early as March 27, 2018, "the swelling and pain ha[d] very slowly started to decrease." *Id.* at 79. Because the "injury [was] improving" and was "very consistent with blunt trauma to anterior shin," Dr. Tsinteris "no longer th[ought] that ordering an MRA [magnetic resonance angiography] is necessary to look at the arteries in her leg for signs of FMD." *Id.* at 87. On April 12, 2018, Dr. Tsinteris evaluated Unitt and concluded that the hematoma had improved and would resolve within a few weeks. *Id.* at 88. By September 12, 2018, Unitt's hematoma had nearly resolved. *Id.* at 89-92.

Unitt made additional requests to the Medical and DOC Defendants for accommodations in the wake of the May 25, 2016 Code 99 incident and her right leg injury. While housed in the HSU awaiting the arrival of her second fan, Unitt insisted that she be permitted to maintain "keep on person" (KOP)

medications. She refused to surrender her medications to a nurse on June 5, 2016, informing medical staff that she had permission to keep her medications in her room. However, on June 6, 2016, medical staff confiscated Unitt's KOP medications and noted in her file that Unitt was "not ok in her room." Hermann-Gomes Aff. ¶ 12. Unitt subsequently refused her daily medications on several occasions. *Id.*[12]

Unitt also requested a medical alert bracelet. *See* DOC Defs.' Ex. A (Unitt Dep.) (Dkt # 142-2) at 102. Unitt's medical restrictions list indicates that a bracelet was provided from September 16, 2016 through September 16, 2017, but not renewed. Hermann-Gomes Aff. ¶ 4. Given the availability of 24-hour onsite medical staff at MCIF, medical alert bracelets were deemed by the staff as unnecessary. *Id.* ¶ 5. Accordingly, Dr. Tsinteris wrote to Unitt in a December 14, 2017 letter that "[t]here is no medical reason [Unitt] need[ed] to be wearing a bracelet that informs people of [her] FMD." DOC

---

[12] Unitt stated that, when she would not sign a refusal form during this HSU stay, Sergeant Jason Allain grabbed a clipboard from her. DOC Defs.' Ex. E at 34. During this incident, CO Destiny Ordway "just stood there and smirked." *Id.* at 38. Although Unitt acknowledged that Allain made no physical contact or verbal threats, she alleges that she had severe PTSD, could not sleep, and avoided the HSU in fear of being harmed by him. *Id.* at 36; DOC Defs.' Ex. D (Unitt Dep.) (Dkt # 142-5) at 32; DOC Defs.' Ex. F at 32; Pl.'s Exs. 24 & 25 (Dkt # 153-3).

Defs.' Ex. K (Dkt # 142-11). Although she has no personal knowledge of the fact, Unitt attributes this decision to Hallett. DOC Defs.' Ex. D at 91.

Although Unitt reported no injury from her fall on May 25, 2016 and no diagnostic tests were performed, she purportedly hurt her shoulder. *See* Med. Defs.' Ex. F Vol. IV at 18 ("When I fell, my right side of my shoulder literally bumped off the big root of the tree outside."). Dr. Tsinteris requested a "no wrist cuffs" accommodation for Unitt during transportation in November of 2016, which was set to last for three months while Unitt underwent physical therapy for her shoulder. DOC security denied Dr. Tsinteris's request to renew the order in March of 2017. Instead, Unitt received a waist restraint accommodation that remained in place until her release from prison. The accommodation did not require her to place her hands behind her back, thereby risking an exacerbation of her rotator-cuff injury. Groblewski Aff. ¶ 52; Med. Rs. at 94-96, 112.

Unitt also requested an egg crate mattress as an accommodation in March of 2017. Med. Rs. at 93. As the DOC considered egg crate mattresses a fire hazard, they were allowed only sparingly. Groblewski Aff. ¶ 54. On March 29, 2017, Dr. Tsinteris explained to Unitt that she was "looking into . . . indications for an egg crate mattress . . . but will have to wait to discuss it with Dr. Gaffar when she gets back. No egg crate mattress pads will be

approved without her approval." Med. Rs. at 93. The restrictions committee determined that Unitt did not meet the criteria for the mattress; instead, she received alternative accommodations, including a second regular mattress, extra blankets, and extra pillows. *Id.* at 110-113; Groblewski Aff. ¶ 56.

Unitt also requested accommodations for her right leg injury, including a front of the line pass that would give her priority in obtaining her medications[13] and in-unit meal delivery. In response to Unitt's October 24, 2018 request for in-unit meals, Dr. Tsinteris concluded that "[a]mbulation is beneficial for exercise and prevention of leg clots and [she] do[es] not see a medical necessity to have [Unitt's] meals delivered to her." Med. Rs. at 104-106. When Unitt repeated the request on October 31, 2018, Dr. Tsinteries iterated that it would only be "appropriate recommending meal delivery as medically necessary if she had a communicable disease or if she were unable to leave her cell, which is not the case." *Id.* at 107-109.

Based on these grievances, Unitt filed this lawsuit alleging violations of the Americans with Disabilities Act and the Eighth Amendment. Only certain Eighth Amendment violations remain. On February 26, 2021, defendants moved for summary judgment.

---

[13] On February 15, 2018, Unitt requested the front of the line pass, which she received the same day. Med. Rs. at 98-100.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the court cannot "draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Pina v. The Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014), quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007). Rather, a genuine issue of material fact "must be built on a solid foundation – a foundation constructed from materials of evidentiary quality." *García-González v. Puig-Morales*, 761 F.3d 81, 87 (1st Cir. 2014) (internal marks omitted), quoting *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013).

### A. Exhaustion of Administrative Remedies

The court need not reach Unitt's claims against Sholudko, Richards, or Superintendent Henderson, as she failed to exhaust her administrative remedies with respect to these defendants. Under the Prison Litigation

Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Unitt acknowledged in her deposition that she had neglected to file a grievance about her issue with Superintendent Henderson.  DOC Defs.' Ex. E at 67.  She argues, however, that she properly grieved her claims against Richards and Sholudko through a letter to Superintendent Hallett because formal grievance forms were not required until June of 2017.  Opp'n to Med. Defs.' Mot. at 21.[14]  Contrary to this assertion, MPCH's Clinical Grievance Mechanism Policies required inmates with complaints about their healthcare to follow a three-step administrative process.  Med. Defs.' Ex. E (Sholudko Aff.) (Dkt # 145-5) ¶ 2.

Because a prison's rules "define the boundaries of proper exhaustion," *Jones v. Bock*, 549 U.S. 199, 218 (2007), Unitt's letter does not satisfy the PLRA's exhaustion requirement.  Even if the court could accept Unitt's interpretation of MCIF's exhaustion requirements, the letter that she

---

[14] The court notes that this and other portions of Unitt's opposition to the Medical Defendants' motion for summary judgment exceed the twenty-page limit provided for by Local Rule 7.1(b)(4), and that Unitt never sought leave from the court to surpass this limit.

attaches as proof of her formal grievance against Richards and Sholudko is dated June 5, 2016 and concerns claims against Amanda Brown. *See* Pl.'s Ex. 36 (Dkt # 152-4). Unitt's claims against Richards and Sholudko arose in 2017 and 2018, respectively, after this letter was sent and after MCIF required inmates to file using DOC Grievance Forms.

## B. Medical Defendants

To prove an Eighth Amendment violation of inadequate medical care, a prisoner must satisfy two elements – one objective, the other subjective. First, "the alleged deprivation must be, objectively, 'sufficiently serious,' . . . [it] must result in the denial of 'the minimally civilized measure of life's necessities.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). In the context of a claim of deficient medical care, as in this case, the harm takes the form of a failure to address a "serious medical need." *See Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 161-162 (1st Cir. 2006). A serious medical need is one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018), quoting *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014).

Second, a plaintiff must prove that prison officials were deliberately indifferent to that need. *Wilson*, 501 U.S. at 302-303. Deliberate indifference entails "'recklessness,' . . . not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable." *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991). To demonstrate this mental state, Unitt must proffer "evidence that the absence or inadequacy of treatment is intentional," *Perry v. Roy*, 782 F.3d 73, 78-79 (1st Cir. 2015), or, said otherwise, that defendants' conduct is "so clearly inadequate as to amount to a refusal to provide essential care," *Torraco v. Maloney*, 923 F.2d 231, 234, 235 (1st Cir. 1991), quoting *Miranda v. Munoz*, 770 F.2d 255, 259 (1st Cir. 1985); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Here, Unitt's failure to submit expert medical evidence is fatal to her Eighth Amendment claims. While testimony from a medical expert or treating physician may not be necessary in all cases alleging prison officials' deliberate indifference to a serious medical need, *see Griffin v. Dionne*, 2015 WL 1457628, at *3 (D.N.H. Mar. 30, 2015) (collecting cases), it becomes so when claims fall outside a layperson's competence to assess, *see*, *e.g.*,

*Daggett v. York Cnty.*, 2021 WL 868713, at *37 (D. Me. Mar. 8, 2021); *cf.*

*Wittkowski v. Levine*, 382 F. Supp. 3d 107, 116 (D. Mass. 2019) (observing

that "the plaintiff must typically proffer expert testimony to establish the

applicable standard of care" for a medical malpractice claim).

 Unitt alleges that Novoa's and Halowecki's refusals to provide her with

a second fan as well as Brown's failure to diagnose her reported stroke-like

symptoms in May of 2016 constituted constitutionally inadequate care that

resulted in her subsequent TIAs.  Order (Dkt # 76) at 4-5.  Yet the etiology

underpinning Unitt's remaining Eighth Amendment claims – namely, that

the interplay between several conditions and her prescription drug regimen

impacted her ability to thermoregulate and put her at risk of stroke – is

medically complex.[15]  While "[e]ven a significant risk of future harm may

suffice" to establish a serious medical need, *Perry*, 782 F.3d at 79, as in the

risk of a future stroke, assessing that risk lies well beyond the ken of a

layperson (or jury).

 Moreover, no medical professional found that Unitt suffered a stroke

in May of 2016, let alone that a second fan would have prevented one.  Med.

---

[15] Defendants' expert acknowledged that high blood pressure can cause heat intolerance, but did not find in the medical literature "any association of FMD with thermoregulation."  Fowlkes Rpt. (Dkt 129-1) at 9-10.

Defs.' Ex. F Vol. III at 24-29.[16]  As MPCH providers consistently concluded that a second fan was not medically indicated, Halowecki was not "interfering with treatment prescribed" by denying Unitt an accommodation not yet authorized.  Opp'n to Med. Defs.' Mot. at 7.  Although Unitt stresses that Dr. Athienies considered her request for a second fan to be reasonable, *id.* at 3, defendants' medical expert indicates that this impression was based upon Unitt's inaccurate report of her medical history, Fowlkes Rpt. at 11.  In any event, MPCH providers are not required to adopt treatment recommendations of outside specialists that are "reasonable" rather than "necessary."  Groblewski Aff. ¶ 17; *see also* 103 DOC 610.01(2) ("Matters of medical, mental health and dental judgment are the sole province of the responsible physicians . . . ."); *Layne v. Vinzant*, 657 F.2d 468, 473 (1st Cir. 1981) ("The right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice.").[17]  Absent any evidence

_____

[16] Unitt provides no records from any treating doctor following her April 8, 2019 release from MCIF.  In other words, she submits no evidence that disputes the opinion of her MPCH providers.  Although a pre-incarceration report from Dr. Kinnard suggests that she had a "mild stroke after an episode of elevated blood pressure," Med. Rs. at 29, defendants' medical expert opines that there is no evidence that Unitt suffered a stroke prior to her imprisonment based on his review of her MRI scans, Fowlkes Rpt. at 9-13.

[17] According to Unitt, Novoa ridiculed her in relaying this MCIF policy.  Opp'n to Med. Defs.' Mot. at 7.  Having found no evidence that Unitt had a

challenging these conclusions apart from Unitt's self-diagnosis, it is not the role of the court to second guess the judgment of qualified medical professionals. *See Youngberg v. Romeo*, 457 U.S. 307, 323 (1982); *Bradshaw v. Corr. Med. Servs., Inc.*, 6 F. App'x 45, 46 (1st Cir. 2001).

### C. DOC Defendants

Nor can Unitt sustain her Eighth Amendment claims for inadequate care against the DOC Defendants. While "[p]rison officials are not relieved of a duty to provide adequate medical care by contracting that responsibility out to private medical vendors," *Reaves v. Dep't of Corr.*, 333 F. Supp. 3d 18, 23 (D. Mass. 2018), citing *West v. Atkins*, 487 U.S. 42, 56 (1988), "non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care," *Spencer v. Bender*, 2010 WL 972207, at *7 (D. Mass. Mar. 11, 2010), quoting *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir. 2008).

Unitt brings a slew of Eighth Amendment claims against the DOC Defendants, alleging that: Henderson, Hallett, Higgins and Bissonnette were deliberately indifferent for not providing her with a second fan, Am. Compl.

---

serious medical need for a second fan, however, the court need not reach Novoa's subjective demeanor while explaining to Unitt the prison's protocol regarding independent specialist recommendations.

(Dkt # 59) ¶¶ 46-47, 53, 57; Allain, Deblois, and Bellany removed her KOP medications during her June of 2016 HSU stay, *id.* ¶¶ 68, 111; Allain physically assaulted her while Ordway watched, *id.* ¶ 69; Hallett and Bissonette refused her a medical alert bracelet for her FMD, *id.* ¶ 106; and DeBlois, Bellany, and Chamberland were deliberately indifferent by refusing to summon medical help for her right leg injury, *id.* ¶¶ 61-63.

The court will not second guess DOC Defendants who followed the judgment and recommendations of MPCH providers in denying Unitt accommodations, including her requests for a second fan and a medical alert bracelet. *See Hennessy v. Dennehy*, 2010 WL 3464234, at *8 (D. Mass. Sept. 1, 2010) ("Since most prison officials are not doctors, they cannot be said to have consciously disregarded an inmate's serious medical needs when they have relied in good faith on the expertise of the inmate's attending physicians."). Likewise, confiscating Unitt's KOP medications while she stayed in the HSU conformed to the DOC's Pharmacy and Medication Policy of "return[ing] KOP medications to the health service unit for watch-take administration," 103 DOC 661.07(19); *see* Hermann-Gomes Aff. ¶ 9; DOC

Defs.' Ex. H (Peterson Aff.) (Dkt # 142-9) ¶ 13, to which only medical staff could make exceptions, DOC Defs.' Ex. C (Hallett Aff.) (Dkt # 142-4) ¶ 6.[18]

Similarly, the DOC Defendants' refusal to examine Unitt or to call medical staff for her right leg injury fails to establish their deliberate indifference. Contrary to Unitt's argument that the "officers could see [her] severe internal bleeding," Opp'n at 18, the DOC Defendants were unqualified to "ma[ke] any medical determinations regarding [her] alleged injury," DOC Defs.' Mot. (Dkt # 143) at 19; *see Navedo v. Maloney*, 172 F. Supp. 2d 276, 285 (D. Mass. 2001).[19] Whatever their attitude towards Unitt, requiring her to submit a routine sick call slip to request medical care was not an inappropriate response, *see*, *e.g.*, *Dennison v. Prison Health Servs.*, 2002 WL 31026529, at *7 (D. Me. June 7, 2002), and she promptly received medical attention, including visits with medical staff, x-rays, and accommodations in the days that followed.

---

[18] In any event, Unitt proffers no evidence of a serious medical need to keep her medications on her person. To the contrary, evidence suggests that her compliance with medications and treatment was inconsistent. Fowlkes Rpt. at 10.

[19] Unitt recognized that her hematoma did not present an emergency, as on her March 24, 2018 sick call slip she did not request to see her doctor until March 28, 2018. *See* Att. 1 to Hermann-Gomes Aff.

Finally, Unitt presents insufficient evidence that Allain or Ordway violated her Eighth Amendment rights. Contrary to Unitt's allegation that, on June 18, 2016, Allain "physically assaulted her" while Ordway "did nothing but watch[]," Am. Compl. ¶ 69, her deposition testimony disavowed these allegations.

## ORDER

For the foregoing reasons, defendants' motions for summary judgment are <u>ALLOWED</u>. The Clerk will enter judgment accordingly and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE